DANIED, J.
It is stated in the bill and admitted in the answers, that the note for fifteen hundred dollars on which the suit is founded, was given for the purpose of taking up or retiring a note, for the same sum, drawn by Thweatt and endorsed by Young, for the accommodation of Thweatt* in pursuance of the agreement recited in the deed of trust filed as exhibit No. 1. And it is also admitted that the last mentioned note was made and given in strict conformity with the understanding and agreement of the parties set forth in the covenant of the 20th of December 1844, filed as exhibit No. 3. It is also further admitted that nothing had occurred, prior to October 1847, to relieve or exonerate Deslíe, Floyd, Tennant or Mrs. Macfarland from the liability which they severally incurred, by virtue of said covenant, to contribute towards making good any loss which Young might sustain, in consequence of his endorsement of said note.
If that liability is gone, at what time did it cease to exist? By what act has it been lost or destroyed? It is not pretended that the appellees have themselves *done any thing avowedly in discharge of it: And there is an entire absence of any proof or even allegation that Young has, ever, in express terms, released the parties from their covenant, or forgiven them their liability to indemnify him.
Det it be, that so soon as Thweatt withdrew his custom from Oaks ware-house, there ceased to be any obligation on the part of Young to make farther advances of money or endorsements of new paper for him, and that the other parties to the covenant were thenceforward discharged of all liability to indemnify Young for losses sustained on account of fresh loans of money or credit for the accommodation of Thweatt; still it is not perceived how this consideration can, in any manner, affect the duties and obligations of the parties, in respect to advances made, or liabilities, as endorser, incurred by Young before the happenings of that event. Nor is it perceived how even, by coupling this with the further concession that Thweatt transferred his custom from Oaks to another ware-house with the knowledge and even approbation of Young, any case is yet made discharging the other parties to the covenant from their duty of participating in any loss arising out of the endorsement by Young of the note of fifteen hundred dollars.
No limitation to the continuance of the social business relation between the parties, growing out of the contract between Thweatt and Young, and the covenant between Young and the other parties, is provided for in either of those agreements. Yet when we' look to the nature of the understanding between the parties and the objects of their quasi partnership, I can perceive no ground for imputing a breach of contract or of good faith either to Thweatt in ceasing to send, or to Young in advising him to discontinue sending, his tobacco to Oaks ware-house, under the change of circumstances which had taken place.
*The understanding between the parties can hardly be interpreted, I apprehend, as meaning that the relation between them, established by force of the agreements just mentioned, was to continue during their lives, regardless of all changes of their respective conditions, and after all the motives, on which that relation was founded, had ceased to exist. The limits to the continuance of the reciprocal obligations of the parties to keep up such a connection must, from the very nature of the latter, be identical with those that bound the existence of the objects and motives in which the connection had its origin. By sending to Oaks warehouse the tobacco over which he had control, as a commission merchant, Thweatt would contribute directly to the advancement of the perquisites and emoluments of Young as an inspector. The motive which Young had, therefore, for entering into the contract, was plain. That motive continued to operate so long as he remained inspector at Oaks. Dike motives influenced the proprietors of the ware-house in entering into the covenant. Their revenues as owners of the house depended on the number of hogsheads which might be sent to it. They had an obvious motive of interest in obtaining the custom of Thweatt. They had a lively concern in seeing that his credit as a commission merchant was sustained. On the other hand, Thweatt, by agreeing to send his tobacco to Oaks, induced Young to lend him the use of his means and credit. And as to Floyd, his objects were common with those of Young. The obligations of the parties to and among themselves, it is apparent, therefore, grew out of, and rested upon, a community or reciprocity of motives and interests. And whenever a state of things might arise which would render it impossible that the object, contemplated by’either one of the parties to the understanding, could be any longer promoted by continuing the relation, obvious *justice would seem to require that he, as well as the others, should be thenceforward absolved from the duty of continuing it. Det it be that no one of the parties had a right, ex mero motu, and without the consent of the others, abruptly to terminate the relation ; yeti do not think that a party to such a contract would do any wrong to the other parties in retiring from the connection whenever, without fault on his part, any event might occur rendering it impossible that he could longer derive benefit from the existence of the partnership. Suppose that Thweatt, from permanent disease or other cause, had been rendered unable to *470 carry on his business as a commission merchant, what claim, in law or equity, would the other parties or either of them have had against him for damages arising out of his failure thereafter to send tobacco to Oaks ware-house ? Or suppose that the inspection at said ware-house, without fault on the part of the proprietors, had been discontinued, what show of justice or propriety would there have been in Young’s requiring that they should still aid him in sustaining-the credit of Thweatt? Or suppose (as is the case) that Young has been superseded in his office of inspector at Oaks by the appointment of another person in his place, what right have the proprietors to impute legal blame to him for thereafter using his money, his credit and his influence for the purpose of increasing the inspections at any other ware-house in whose well doing he might take or feel an interest ?
It seems to me that on the happening of either of the events just supposed, any one of the parties would have had a right, without accountability therefor to the others, to dissolve the connection. And when Young, under the cricumstances disclosed in the record, ceased to be an inspector at Oaks, he had a perfect right to transfer his influence to any other ware-house ; and if, as is alleged, he advised Thweatt to *pursue a similar course, he did nothing on which the proprietors can found any claim, in law or equity, against him. The defense to his demand, based on his conduct in this regard, is therefore, I think, wholly untenable. Nor do I think that the other grounds relied on furnish any better show of justice.
It is- true, that by the terms of the covenant Young was charged with the duty of using all proper diligence to see that the trust deed of the 20th December 1844, executed by Thweatt for his indemnity, should be made available. There is, however, the entire absence of proof to show that he, in any respect, neglected that duty. No proof has been offered to show that, by pursuing a course different from that taken, the trust fund could have been made to yield a dollar more than the sum which has been realized from it. Besides, Deslie, one of the proprietors, was the trustee in the deed, and he, as well as the others, had an interest in seeing that the trust fund should be made as productive as possible ; and if he or they saw any mismanagement or misapplication of it by Thweatt, duty as well as interest would have prompted them to complain of it. No such complaint appears to have been made, and it is but fair to infer that no ground for any existed. And it is shown that so soon as it became known that Thweatt had failed, Young suggested the only step that was taken towards securing the trust subject, by directing Deslie to demand of Thweatt his books, papers and accounts.
The idea that the last provision of the deed imparted any new or further force to the agreement between Young and Thweatt, by which the latter stipulated to send his tobacco to Oaks, is, I think, without any foundation. By that provision, Young is not to require the trustee to close the trust until the expiration of twelve months from the date of the deed, unless in case of the death of Thweatt; or unless *Young shall consider himself in danger of losing by a further continuation of his business, and the trustee shall consider his fears well grounded ; or unless Thweatt shall fail to comply with his agreement to encourage the ware-house by sending his tobacco, &c. It will be seen that this last provision has direct reference to the agreement between Thweatt and Young; and even if it could be treated as a covenant by Thweatt, its extent is, by the express terms of the provision, to be measured by that of the agreement. The agreement and the said supposed covenant have the same scope and force, and when the agreement was discharged or fulfilled (as we have endeavored to show it has been), the supposed covenant in the deed was also performed or ceased to be of any further obligatory force. And if under the circumstances Thweatt had a sufficient excuse for the failure to continue his custom to the ware-house, surely no blame attaches to Young for omitting to close the trust merely on the score of such failure.
Nor can I see bow the rights and duties of the parties to the covenant of the 20th December 1844, have been in any manner affected by the consideration that the note of fifteen hundred dollars was, in its origin and at several renewals, endorsed by Deslie and Tennant, and that after Young was removed from his office of inspector and Thweatt ceased sending his tobacco to Oaks, Deslie and Tennant discontinued their endorsements ; and that in the subsequent renewals of the note their names, as endorsers, were substituted by those of Blick and Wyatt. The endorsement of the note by Deslie and Tennant was not in conformity with any requirement of the covenant. Their undertaking in the covenant was not to endorse for Thweatt or for Young, but to pay their shares of any loss sustained by Young in consequence of his endorsement for Thweatt. They had strong motives *of interest, as we have shown, in sustaining Thweatt as a commission merchant, but their endorsement of his notes was a matter wholly beside and out of their covenant with Young. Their endorsement of the note gave no new force to the covenant; and their declining to continue that favor or accommodation after the 1st of October 1847, detracted none from it. Their conduct in this regard has no legal import or effect whatever, bearing on their covenant. If they desired that Young should also forthwith decline to renew the note and close the trust, they should have notified him to that effect. The mere withdrawal of their names from the paper surely could not perform the office of such a notice.
If there was any proof that the substitution of the names of Deslie and Tennant by those of Blick and Wyatt was made in pursuance of any agreement on the part of the latter, to exonerate the parties to the covenant from their duty to indemnify Young, the case might be different. But there is no such proof ; and in its absence, the only effect of that circumstance was to relieve *471 Leslie and Tennant from all liability as endorsers of the note, and to leave the covenant, as it stood before, in full force and virtue.
By the substitution of the new note for the old one, the evidence of the debt was changed; but the debt of Thweatt to the bank, the liability of Young, as the first endorser, for it, and the duty of Leslie, Tennant, Floyd, and Mrs. Macfarland to indemnify him against that liability, all remained the same.
I can see nothing in the case on which the appellees can rely to set off or discharge their undertaking, or Which makes it inequitable or unconscientious in Young to insist on the indemnity for which he has contracted. In the view I have taken of the case, the note for fifteen hundred dollars, and the two notes for eight hundred and seventy-five dollars each, all stand on the same footing ; and I think that the court, instead of rendering the decree complained of, should have held the several parties to the covenant liable for the aggregate of the three debts in the proportions provided for in said convenant, to wit: Leslie one-sixth, Floyd one-sixth, Tennant one-sixth, Young one-sixth, and Mrs. Macfarland two-sixths. And as Floyd is insolvent, and by the terms of the covenant Young is restricted in his recourse against the other parties to the amounts of their shares, of any loss, respectively ; and as Young, in his character of first endorser of the notes paid by Tennant, is primarily liable, and he and Tennant are the only parties to the covenant who have paid more than their shares of the loss, in adjusting the liabilities of Young, Leslie, Tennant and Mrs. Macfarland, Young should account for Floyd’s one-sixth, and the whole fund in the control of the court should be applied first to the reimbursement of Tennant for all that he has paid over and above his one-sixth of the whole loss.
I am for reversing the decree, with costs to the appellant, and remanding the cause for farther proceedings, and a final decree in conformity with the foregoing views.
The other judges concurred in the opinion of Daniel, J.
The decree was as follows :
It seems to the court, that nothing is shown in the pleadings or proofs which can impair the force of the covenant of the 20th December 1844, filed as exhibit No. 3, or make it inequitable or unconscientious in Young to insist that the other parties thereto shall contribute towards making good the loss sustained by him in' consequence of his endorsement of the note of fifteen hundred dollars, in the proportions provided for *in said covenant. It further seems to the court, that the ultimate liabilities of the parties to said covenant, in regard to the two notes of eight hundred and seventy-five dollars each, are the same with those which have attached to the said note of fifteen hundred dollars ; and that the three notes should be treated as constituting one entire debt or liability, for any loss arising out of which the parties to the said covenant of the 20th December 1844 ought to be held liable in the following proportions, that is to say, Young one-sixth, Tennant one-sixth, Floyd one-sixth, Leslie one-sixth and Mrs. Macfarland two-sixths. And it appearing to the court that Floyd is insolvent, and that by the terms of the covenant aforesaid, Young has no right to recover, of the other parties thereto, anything more than the amounts of their respective shares or proportions of losses sustained by him in consequence of his endorsement for Thweatt, it seems to the court that in adjusting between the said Young, Tennant, Leslie and Mac-farland their- ultimate liabilities, Young should be held to account for the share or proportion of loss due by said Floyd. And it further appearing to the court that Tennant and Young are the only parties who have paid more than their shares of said loss, and Young, as a consequence of his being the first endorser on the two notes of eight hundred and seventy-five dollars each paid by Tennant, being liable to said Tennant therefor ; and it also appearing that after applying the trust fund in the control of the court to the relief of Tennant, the balance paid by him will still be more than his share or proportion of the aggregate loss, it further seems to the court that said fund should be first applied towards the reimbursement of said Tennant for so much as he has paid exceeding his said share. It is proper also that there should be such decrees against Floyd and Thweatt respectively *as will fix the ultimate liabilities of all the parties in accordance with their several undertakings.
It therefore seems to the court, that the decree of the 10th of June 1852 is erroneous, and ought to be reversed. And the court doth adjudge, &c., that the same be reversed, with costs to the appellant. And the cause is remanded for further proceedings and a final decree in accordance with the principles herein above declared.